1  Matthew Borden, Esq. (SBN: 214323)
   borden@braunhagey.com
2  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
3  San Francisco, CA 94104
   Telephone:  (415) 599-0210
4  Facsimile:  (415) 276-1808

5  Special Master

6

7                    **UNITED STATES DISTRICT COURT**

8                   **NORTHERN DISTRICT OF CALIFORNIA**

9

10
    STRAIGHT PATH IP GROUP, INC.,
11
                Plaintiff,                          Case Nos. C 16-03463 WHA
12                                                             C 16-03582-WHA
            v.
13                                                 **REPORT AND RECOMMENDATION**
    CISCO SYSTEMS, INC.,                           **OF SPECIAL MASTER**
14
                Defendant.
15

16  STRAIGHT PATH IP GROUP, INC.,

17              Plaintiff,

18          v.

19  APPLE INC.,

20              Defendant.

21

22

23

24

25

26

27

28

In this dispute over Defendants' entitlement to attorney's fees under 35 U.S.C. § 285, it is recommended that Defendant Apple, Inc. be awarded $2,334,054 and Defendant Cisco Systems, Inc. be awarded $1,920,146 in attorney's fees.  In accordance with the Court's Order Appointing Special Master (*Apple*, Dkt. No. 248; *Cisco*, Dkt. No. 229) ("Order"), this constitutes the special master's final report and recommendation concerning Defendants' fee dispute with Plaintiff Straight Path IP Group Inc.

## **PROCEDURAL HISTORY**

On December 16, 2019, an initial conference was held at which three threshold questions were raised for further briefing:  (1) whether Defendants can recover non-taxable costs; (2) what is the applicable causation standard for awarding attorney's fees in this proceeding; and (3) whether a lodestar calculation is the only methodology for determining an award of attorney's fees under 35 U.S.C. § 285.

Defendants and Plaintiff submitted their respective legal briefs on January 6, 2020, and January 20, 2020, respectively.  A hearing on the threshold legal issues was held on February 5, 2020.

On February 6, 2020, Plaintiff submitted a one-page brief on whether Apple had waived its right to seek fees defending against Plaintiff's unsuccessful appeal of the Court's Order granting summary judgment.  On February 7, 2020, Apple submitted a one-page response.

On February 10, 2020, an Interim Report was issued, explaining how the special master recommended resolving the threshold legal questions.  Plaintiff was asked to provide Apple with specific objections to the projects and hours identified by Apple.  The two parties were requested to meet and confer and to submit a joint brief identifying any remaining issues for resolution.

As for Cisco, the Interim Report provided:  "Cisco is asked to recreate billing information in the form required by the Court's Order re Attorney's Fees and Costs and Appointment of Special Master and serve it on Straight Path. Cisco and Straight Path must then meet and confer and present their remaining disputes, if any, to the undersigned" (Interim Report at 8-9).

On February 18, 2020, Apple and Plaintiff made their joint submission, followed by a hearing on February 27, 2020.

1    On February 27, 2020, Cisco and Plaintiff made their joint submission, with an ensuing

2  hearing on March 3, 2020.[1]

3  ### ANALYSIS AND RECOMMENDATIONS

4    In addition to their disputes over the quantum of fees requested by Defendants, the parties

5  raised the three legal issues for consideration.  These are addressed first, followed by an analysis

6  and calculation of each Defendant's requested fees and Plaintiff's objections.

7  ## I.    COMPENSATION OF NON-TAXABLE COSTS

8    Cisco seeks an award of non-taxable costs, mostly relating to the expert fees it incurred in

9  this litigation.  As set forth below, such an award is not compensable in this case.

10    Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney

11  fees to the prevailing party."  The Federal Circuit has read this language to *exclude* expert costs.  In

12  *Amsted Industries, Inc. v. Buckeye Steel Castings Co*., 23 F.3d 374 (Fed. Cir. 1994), the court held

13  that "an award under section 285 encompasses only attorney's fees; expert witness fees fall under

14  28 U.S.C. § 1920, subject to the 28 U.S.C. § 1821(b) limitation [limiting witness fees to $40/day]."

15  *Id*. at 377.  The court further stated that "[t]o the extent that this court's prior precedents hold that

16  section 285 authorizes an award of expert fees, *West Virginia* overruled them."  *Id*.  Under *Amsted*

17  *Industries*, Defendants cannot recover expert costs here.  The Federal Circuit's reasoning that

18  section 285 only permits the recovery of attorney's fees also excludes other non-taxable costs.

19    Cisco cites *Maxwell v. Angel-Etts of California, Inc*., 53 F. App'x 561, 569 (Fed Cir. 2002),

20  where the court upheld an award of non-taxable costs.  However, *Maxwell* is an unpublished

21  disposition that is based on precedent that *Amsted Industries* stated had been overruled.

22  Accordingly, *Maxwell* does not support awarding Defendants non-taxable costs here.

23    Cisco also cites other district court cases (Supp. Br. at 1), but they do not undermine the

24  rule set forth in *Amsted Industries*.  In *Kilopass Tech., Inc. v. Sidense Corp*., 82 F. Supp. 3d 1154,

25  1174-75 (N.D. Cal. 2015), the court may have awarded some non-taxable costs.  However, it does

26
[1] On February 18, 2020, when it was supposed to provide detailed time entries required by the
27  Court's Order, Cisco instead submitted an assortment of materials, apparently in an attempt to
   buttress its fee request.  The submission did not contain time entries or other relevant fee
28  breakdowns from Cisco's lead counsel at the Desmarais LLP law firm.  The only materials from
   that submission that are accepted for consideration are Baker Botts' time notes.

not appear that the plaintiff objected to such an award.  Similarly, in *Yufa v. TSI Incorporated*, No. 09-cv-01315-KAW, 2014 WL 4071902, *8 (N.D. Cal. Aug. 14, 2014), it also does not appear that the plaintiff objected to paying non-taxable costs.  Neither decision offers any rationale for departing from *Amsted Industries*.

Finally, Cisco asserts that it should be awarded expert costs pursuant to the Court's inherent powers.  This argument is inconsistent with the Court's holding that:  "Defendants, however, have not sufficiently shown that Plaintiff's infringement theory alone amounted to recklessness (even assuming this standard applies) or bad faith warranting sanctions under Section 1927 or the Court's inherent powers" (*Cisco*, Dkt. No. 244 at 12).  In its Supplemental Brief, Cisco argues that the Court separately instructed the parties to delineate expert fees (*Cisco*, Dkt. No. 226 at 2) and asserts that this evidences that the Court intended to use its inherent powers to award such costs (Cisco Supp. Br. at 2).  The Court's instruction does not appear to be a ruling that Defendants are entitled to expert fees under the Court's inherent powers.  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (before awarding sanctions pursuant to its inherent power, "the court must make an express finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith'").  Reading the Court's Order in this manner would be inconsistent with the Court's finding that Defendants failed to make a sufficient factual showing to obtain such sanctions under the Court's inherent powers.

In sum, non-taxable costs should be disallowed.  As for taxable costs, the parties should present a conforming bill of costs directly to the Court.

## II.    THE SCOPE OF FEES SUBJECT TO AWARD UNDER SECTION 285

The parties dispute the scope and type of fees that may be awarded as exceptional under Section 285.  Each issue is addressed in turn.

### A.    Defendants May Recover Legal Fees, Except Those with Little or No Relation to Plaintiff's "Exceptional" Conduct

The purpose of an award of attorney's fees under the statute is to make whole a party injured by its adversary's "exceptional" conduct.  *Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1278 (Fed. Cir. 2018).  The Federal Circuit has determined that, while courts have broad

discretion in determining what attorneys' fees are compensatory, those fees must relate to the exceptional conduct. *Id*. at 1278-79.

In its underlying Order, the Court tasked the special master with identifying "each item requested that bears little or no relation to the conduct found exceptional herein." Accordingly, the care has been taken to ensure that fees will not be awarded for tasks unrelated to the exceptional conduct at issue in the case.

**B.      Appellate Fees**

In addition to fees incurred during the district court litigation, Apple seeks fees incurred in response to Plaintiff's appeal of the Court's summary judgment decision. As a general matter, district courts have authority to award legal fees arising from an appeal of an order dismissing a lawsuit found to be exceptional. *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc*., 876 F.3d 1372, 1380 (Fed. Cir. 2017) ("We have previously held that section 285 does not bar the trial court from awarding fees for the entire case, including any subsequent appeals.") (quoting *Therasense, Inc. v. Becton, Dickinson & Co*., 745 F.3d 513, 517 (Fed. Cir. 2014)).

Plaintiff makes three arguments contesting such award in this case: (1) that the Court's underlying Order precluded consideration of appellate fees (Supp. Opp. at 1), (2) that Apple should have sought such fees from the Federal Circuit under Federal Rule of Appellate Procedure 38 (Supp. Opp. at 2), and (3) that Apple's request is untimely under Rule 54. This report disagrees with Plaintiff's first two objections, but finds that the third has merit. Apple will need to move the Court under Rule 6 for leave to file an untimely request for award of its appellate fees.

**1.      The Court's Prior Orders Did Not Foreclose Apple's Entitlement To Appellate Fees**

Plaintiff first objects that appellate fees cannot be awarded because the Court's Order on Motions for Attorney's Fees and Costs prohibited awarding fees for proceedings in other fora (Supp. Opp. at 1). Plaintiff bases this conclusion on the Court's ruling that the *inter partes* review of the claims in suit did not involve exceptional conduct (*Apple*, Dkt. No. 244 at 12). What the Court found to be exceptional was that Plaintiff adopted a claim construction in this litigation that was foreclosed by the claim construction it advanced in the Federal Circuit to reverse the Patent

1   Trial and Appeal Board's construction and preserve the validity of the claims in suit (*Id.* at 8-9).

2   Such conduct did not begin until after *inter partes* review was complete.  Thus, the Court's holding

3   that Apple's fees during *inter partes* review are not recoverable does not foreclose the possibility

4   that Apple can recover fees incurred defending an appeal seeking to vindicate conduct found to be

5   exceptional, as the Federal Circuit has permitted in other cases.

6   Here, after the Court granted Defendants' motions for summary judgment of non-

7   infringement, Plaintiff appealed the ruling, sought a rehearing, and petitioned for certiorari, all of

8   which were denied.  The arguments in Plaintiff's appeal involved whether the Court erred in its

9   claim construction and judgment of non-infringement – both of which were based on the conduct

10  the Court found to be exceptional.  Apple should be allowed to recover the attorney's fees it

11  incurred as a result of Plaintiff redoubling its efforts to defend its exceptional claim construction.

12  *Inventor Holdings*, 876 F.3d at 1380.

13          **2.      Apple Was Not Required to Seek Its Fees from the Federal Circuit**

14  Plaintiff next argues that Apple should have sought its appellate fees in the Federal Circuit

15  under Federal Rule of Appellate Procedure 38 (Supp. Opp. at 2).  However, Apple's decision to

16  litigate whether this case was exceptional in district court was reasonable.  *Inventor Holdings*, 876

17  F.3d at 1380 ("The district court 'live[d] with the case over a prolonged period of time,' and was in

18  the best position to award fees as an initial matter for the entire case, including the § 101 appeal.")

19  (internal citation omitted).  Plaintiff argues that its petitions for rehearing and certiorari involved

20  procedural issues that were not based on the claim construction found to be extraordinary (Supp.

21  Opp. at 5).  However, the fees Apple was forced to expend responding to this briefing directly

22  resulted from Plaintiff's attempt to defend the conduct the Court found to be exceptional.  If the

23  underlying actions were exceptional, so too were efforts to defend them at the appellate level.

24          **3.      Apple's Request for Appellate Fees Was Untimely Under Rule 54**

25  Plaintiff finally asserts that Apple's request for appellate fees was not timely submitted to

26  the Court with its fee motion.  Rule 54(d)(2)(B)(iii) states that a party seeking attorney's fees must

27  submit the "amount sought" within 14 days unless otherwise allowed by court order.  The Federal

28  Circuit has held that failure to file a fee motion under section 285 within the time constraints of

1 Rule 54 precludes a party from seeking such compensation.  *IPXL Holdings, LLC v. Amazon.com,*

2 *Inc.*, 430 F.3d 1377, 1385-86 (Fed. Cir. 2005).

3       Apple argues that unlike the defendant in *IXPL Holdings*, Apple's fee motion was timely

4 under Rule 54.  Apple's request for appellate fees, however, was made after the time allowed by

5 Rule 54.  *IXPL Holdings* stated that absent a motion seeking relief under Rule 6, Rule 54 precludes

6 a district court from enlarging time to seek fees.  430 F.3d at 1386.  Apple, however, has not

7 presented any Rule 6 motion to the Court.

8       In light of the foregoing, should Apple wish to seek an award of its appellate fees, it will

9 need to cure its untimely application and request leave under Rule 6.  In the event the Court grants

10 leave, it is recommended that Apple's documented appellate fees be awarded upon the same

11 methodology and process set forth herein as for non-appellate work.

12 **III.     WHETHER "ALTERNATIVE" FEE ARRANGEMENTS ARE COMPENSABLE
          UNDER SECTION 285**

13

14       The fees claimed by Defendant Cisco were paid under an alternative flat monthly fee

15 arrangement with its counsel.  In recent years, law firms have begun offering alternatives to the

16 traditional hourly billing model.  There are advantages to such models, but also risks in

17 circumstances like this where the scope and reasonableness of fees are subject to judicial review.

18 This report concludes that such alternative fee arrangements, whether flat fee or otherwise, may be

19 compensable under Section 285, but that prevailing parties must be required to satisfy appropriate

20 reasonableness standards to ensure fairness and to protect against potential abuse.

21     **A.     Cisco's Alternative Fee Arrangement**

22       Evidence submitted by Cisco shows that since at least 2008, Cisco has entered engagement

23 agreements where it has paid for legal services by the month, as opposed to by the billable hour

24 (1/6/20 Wilcox Decl., Ex. 7).  Cisco's evidence also shows that other sophisticated consumers of

25 legal services, such as Microsoft, have begun paying flat monthly rates to outside litigation counsel

26 (*Id.*, Ex. 4).  According to a report submitted by Cisco, use of flat rates, although not as common as

27 traditional hourly billing, has become increasingly prevalent in the context of employment,

28 financial and patent litigation (*Id.*, Ex. 9).  Set fees enable corporate clients to accurately plan for,

1 and approve, litigation costs without having the large monthly swings in legal expenses that are
2 common in litigation.  They also may help incentivize counsel to litigate (more) efficiently.

3      Because litigation is unpredictable, on any given month, having a flat rate renders the
4 hourly compensation and/or time spent by the law firm variable – more favorable to the client when
5 the case heats up, and more favorable to counsel, when events proceed slowly.  Both sides assume
6 this risk of over- and under- compensation on any given month when entering into the engagement.

7      However, prudential and reasonableness concerns arise when assessing the quantum of
8 these fees to be awarded in a fee-shifting environment.  For example, flat-rate billing structures
9 could compensate counsel at an unreasonable rate, much like a large contingency fee, which Cisco
10 acknowledges would not be recoverable in at least an extreme case.  Flat-fee arrangements also
11 potentially sweep in fees unrelated to the fee-shifting at issue, such as the exceptional conduct here.
12 And opportunity for mischief exists, such as in cases involving manifestly unequal resources, or
13 where counsel enjoys multiple lines of engagement with the same client that might allow mixing
14 and matching among different matters and the shifting of fees as part of an unwritten understanding
15 between attorney and client.

16      In this case, Cisco employed two separate law firms.  Both firms billed Cisco on a flat-rate
17 basis.  Cisco's current counsel states that it never tracks billable hours, except for pro bono
18 engagements, as required by the New York Rules of Professional Conduct.

19     **B.**     **Alternative Fee Arrangements are Compensable, Provided Sufficient Support**
20                **Is Provided to Support a Reasonableness Determination**

21      The parties have briefed whether section 285 allows a court to compensate counsel based on
22 a flat-rate billing model.  There does not appear to be any decision that has addressed this question.
The language of section 285 simply provides for a "reasonable" fee.

23      Plaintiff notes that in the context of statutory attorney's fees, the Supreme Court has
24 endorsed a lodestar calculation.  *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992).  Under this
25 lodestar approach, courts first calculate a reasonable rate at which to compensate counsel and then
26 multiply this by the reasonable number of hours spent.  The decision first adopting this standard,
27 *Hensley v. Eckerhart*, 461 U.S. 424 (1983), further provided that courts could use a multiplier to
28

1    modify the resulting award to account for factors such as the novelty of the issues and the risk of

2    taking a case on contingency.  Over time, however, Supreme Court decisions began eliminating the

3    use of multipliers because the grounds for multipliers were already accounted for.  For example, in

4    *Daque*, the Court held that the risk of contingency was baked into the hourly rate.  It further

5    observed that providing a premium to counsel who took on highly risky cases would not serve the

6    purpose of statutory fees because it would encourage litigation of potentially non-meritorious

7    claims.  *Dague*, 505 U.S. at 565-67.

8         These decisions on statutory fees, while they construe the term "reasonable fee," are not

9    entirely on point in the context of section 285 because they involve statutes where fees are provided

10   to attract attorneys to litigate important social issues.  The goal of such fees is "to enable private

11   parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened

12   violation of specific federal laws."  *Dague*, 505 U.S. at 565.  Assessing the reasonableness of fees

13   in this context often involves trying to estimate what the reasonable hourly rates would be for firms

14   that do not have paying clients.

15        In contrast, section 285 is a commercial statute.  It inevitably involves litigation between

16   two economically motivated actors, whose billing rates are determined by the market.  Its purpose

17   is not to attract counsel to litigate issues that Congress deems valuable, but rather to compensate

18   clients who have been forced to pay needless legal fees due to the other side's "exceptional"

19   conduct.  *See*, *e.g.*, *Mathis v. Spears*, 857 F.2d 749, 753 (Fed. Cir. 1988) ("The purpose of Section

20   285 is to reimburse a *party* injured when forced to undergo an 'exceptional' case.").

21        In the absence of any decision under section 285 where a flat-fee billing arrangement was

22   held to be valid or invalid, this report recommends that a client should be allowed to recover fees

23   paid under a flat-rate billing arrangement, provided that they are reasonable.  Such arrangements

24   are not precluded by the plain language of section 285 and can be consistent with its purpose.

25        Assessing whether fees under an alternative billing arrangement are reasonable can be done

26   in many ways, including comparison with a traditional billing model.  Ways to determine whether

27   such fees are reasonable that do not involve a lodestar calculation also may exist.  For example, in

28   devising what the flat rate will be, both the client and the law firm would have to forecast the

1    number of lawyers, tasks, rates, and time involved to make a rational deal.  Reviewing such data

2    would help assess whether the fees were reasonable.

3          Here, the Court ordered the parties to create detailed billing records specifying the tasks, the

4    hours and the rates of counsel.  At the hearing on February 5, 2020, and in the Interim Report on

5    February 10, Cisco was asked to construct hourly records and to provide project-based billing as

6    the Court had ordered to determine the reasonableness of Cisco's alternative fee arrangements.  As

7    discussed in Section V below, Cisco failed to provide those records.

8    **IV.    PLAINTIFF'S OBEJECTIONS TO APPLE'S FEES**

9          After the legal issues were addressed, Plaintiff and Apple were asked to meet and confer

10   about the specific categories of fees requested by Apple.  For any objection as to the

11   reasonableness of fees, Plaintiff was asked to disclose its fees for purposes of comparison.

12         On February 18, 2020, the parties provided a joint submission of the entirety of their

13   disputes.  They identified 11 separate categories of disputes, which are addressed in Part B below.

14         **A.    Apple's Rates, Billings Structure and Fee Reductions**

15         Pursuant to the Court's Order, Apple submitted an accounting of the fees it actually paid to

16   its counsel (12/5/19 James Decl. ¶ 4, Ex. A).  The accounting was broken into 100 categories to

17   account for unique projects in the case.  For each of the 100 projects, Apple provided redacted time

18   notes reflecting the daily activities of each timekeeper.  This submission complied with the Court's

19   Order Re Attorney's Fees and Costs.

20         **1.    Rates**

21         Apple retained Hogan Lovells, LLP to represent it in this litigation.  Hogan Lovells pitched

22   for the engagement against other law firms.  The rates actually paid by Apple (12/5/19 James Decl.

23   ¶ 30) are discounted from what Hogan Lovells states are its "standard rates."  Over the course of

24   the litigation in this court and in the Federal Circuit, Hogan Lovells raised its rates once in June

25   2018, which was over one year before the Court found this case to be exceptional.  One lawyer's

26   rates were increased in August 2019 and two other associates' rates were increased in May 2019.

27   This was also before the Court found this case to be exceptional.

28

1    The rates charged by Hogan Lovells are reasonable.  They are the rates a sophisticated

2  client actually paid.  They were generated through a competitive process.  They also are consistent

3  with what law firms and lawyers with similar credentials charge (12/5/19 James Decl. ¶¶ 48-54)

4  and are comparable to the rates claimed by Plaintiff's lawyers (2/18/20 Joint Sub. at 16-19).[2]  There

5  is no claim or evidence to suggest that there was any effort to raise these rates collusively.

6                            **2.      Billing Judgment**

7    Apple employs an in-house Legal Operations Manager who oversaw a team that reviewed

8  Hogan Lovells bills before Apple paid them (12/5/19 Declaration of Philip Rawlinson ¶¶ 4-10).  In

9  some instances, although the dates are not clear, this team negotiated discounts on Apple's bills (*Id*.

10  ¶ 14).[3]  Apple separately claims to have exercised billing judgment by reducing its bills by roughly

11  $140,000 before submitting them (12/5/19 James Decl. ¶ 34).  Apple also claims to have excluded

12  fees for case administration tasks, such as team meetings and client updates, and fees for Daubert

13  motions and summary judgment motions that it states that it was in the process of preparing but did

14  not file (*Id*. ¶¶ 8-9).  These deductions are reasonable.

15                       **3.      Apple's Adjustments for the '208 Patent**

16    One of the five patents in suit, U.S. Patent No. 7,149,208 (the "'208 Patent"), does not have

17  the "in connection with" limitation, and the Court did not make any finding of exceptionality as to

18  litigation over this patent.

19    To deduct time spent on the '208 Patent, Apple excluded all time entries identifying the

20  '208 Patent or work thereon, and applied an 80% across-the-board reduction on its fees attributable

21  to all five patents in suit (12/5/19 James Decl. ¶ 6).  A few tasks were exclusively related to the

22  four patents containing the "in connection with" limitation, and Apple seeks all its fees for those

23  tasks (*Id*. ¶ 12).  Plaintiff did not object to Apple's methodology for excluding work done on the

24  '208 Patent.  The methodology employed by Apple was reasonable.

---

[2] Apple's most senior counsel charges $862/hour (12/5/19 James Decl. ¶ 30).  Plaintiff's most senior counsel charges $850/hour (2/18/20 Joint Sub. at 19).

[3] Paragraph 34 of the James Declaration states that the discounts occurred "over the course of the district court case."  The Rawlinson Declaration, however, states that the same discounts occurred between "October 2014 through 2019," which would appear to sweep in activities that occurred during the *inter partes* review (Rawlinson Decl. ¶ 14).

### B.  Plaintiff's Specific Objections to Apple's Fees

Within the 11 categories of disputes Plaintiff raised, Plaintiff mainly objected to the tasks performed as opposed to the reasonableness of the fees.  Its objections are discussed below.

### 1.  Fees Incurred Prior to June 23, 2017

Plaintiff objects to any fees incurred by Apple before June 23, 2017.  It argues that on this date, the Federal Circuit issued one of the decisions that formed part of the basis of the Court's Order finding this case to be exceptional, and that all fees incurred prior to that time are therefore not related to the exceptional conduct found by the Court (2/18/20 Joint Sub. at 2-3).

The exceptional conduct found by the Court, however, did not arise from the issuance of a 2017 Federal Circuit opinion.  Rather, it was "the shifting sands of the patent owner's delineations of the claimed invention's scope" (*Apple*, Dkt. No. 244 at 1), which involved "telling the Federal Circuit one thing and telling this Court the opposite on a critical point" (*Id*. at 7).  Plaintiff first advanced its narrow construction of the "in connection with" element in its appeal from the Patent Trial and Appeal Board's 2014 decision, which resulted in the decision *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O*., 806 F.3d 1356 (Fed. Cir. 2015).  The exceptional conduct found by the Court began on June 24, 2016, when Plaintiff started pursuing an infringement theory in district court that was contrary to the claim construction it advanced in its appellate briefing in *Sipnet* and contrary to the Federal Circuit's 2015 claim construction in *Sipnet*, which the Federal Circuit rendered in reliance on Plaintiff's arguments.  *Id*. at 1363.

By pursuing this exceptional infringement theory, Plaintiff caused Apple to incur substantial legal fees defending against Plaintiff's infringement claims.  As noted in Section II above, all such fees, as long as they are reasonable, should be awarded to compensate Apple for being forced to defend against exceptional claims.

### 2.  Motion to Dismiss

Plaintiff objects to the fees that Apple incurred preparing its motion to dismiss on the ground that the motion was focused on induced infringement, rather than claim construction.  This argument misses the point.  Plaintiff's Complaint contained induced infringement allegations.  The induced infringement allegations were based on the claim construction the Court found to be

1   exceptional.  Apple was within its rights to seek dismissal of these claims to protect itself.  Had

2   Plaintiff not elected to pursue its exceptional claims, Apple would not have incurred these fees.

3   Plaintiff does not otherwise object to the reasonableness of Apple's fees.

### 3.   Motion to Dismiss Amended Complaint

5       Plaintiff objects to the fees Apple incurred moving to dismiss the Amended Complaint

6   (2/18/20 Joint Sub. at 6-7).  Plaintiff does not dispute the amount of fees that Apple incurred, which

7   appears reasonable.  It argues that these fees are not related to claim construction and therefore not

8   compensable.  This argument lacks merit for the same reasons given above; by electing to pursue

9   claims that it should not have brought, Plaintiff forced Apple to defend itself.  It was reasonable for

10  Apple to seek dismissal of Plaintiff's induced infringement claims.

### 4.   Motion for Judgment on the Pleadings

12      Plaintiff objects to the fees Apple incurred in connection with its motion for judgment on

13  the pleadings (2/18/20 Joint Sub. at 7).  It does not object to the amount of fees, but asserts that

14  such fees should not be awarded because (1) the motion was denied and (2) the motion was not

15  related to claim construction.  These arguments also lack merit for the reasons stated above.  This

16  motion was directed to dismissing Plaintiff's infringement claims, which it should not have

17  brought.  Plaintiff makes no showing that the motion was somehow in bad faith or otherwise

18  frivolous and does not cite any authority to refute that a party that files an exceptional case should

19  bear the costs of winning and losing motions.  *See Vehicle Interface Techs., LLC v. Jaguar Land*

20  *Rover N. Am., LLC*, 2016 WL 3436396, *4 (D. Del. June 15, 2016) (citing *Mathis v. Spears*, 857

21  F.2d 749, 755 (Fed. Cir. 1988)) (awarded attorney's fees under § 285 for "unsuccessful motion for

22  summary judgment of non-infringement and motion to dismiss" because "The Federal Circuit has

23  approved fee awards to a prevailing defendant for good faith non-prevailing alternative defenses.").

### 5.   Locate and Review Prior Art and Local Patent Rule 3-3 Invalidity Contentions

25      Plaintiff offers two objections to these categories of fees.  First, it asserts that they are

26  unrelated to the exceptional conduct.  Second, it claims that they are excessive (2/18/20 Joint Sub.

27  at 8-9).

28

1    For the reasons above, this report disagrees with Plaintiff's first argument.  Because

2  Plaintiff filed exceptional claims, Apple was forced to look for prior art to invalidate them.  The

3  costs of developing invalidity defenses are expenses that Apple would not have incurred if Plaintiff

4  had not sued under an exceptional theory of infringement.

5    Plaintiff's objections on excessiveness are twofold.  First, it argues that Apple's fees related

6  to invalidity were much higher than Apple's fees related to non-infringement, the theory on which

7  Apple prevailed.  However, there is nothing inherently excessive about spending more on one

8  defense than another, and Apple offers a number of good reasons why it took more effort to prepare

9  its invalidity defenses – including that Plaintiff had, by that time, advanced multiple claim

10  constructions for the patents in suit, and that proving invalidity requires finding and analyzing

11  multiple pieces of prior art (2/18/20 Joint Sub. at 9-11).

12    Second, Plaintiff claims the overall amount claimed for both these projects combined is

13  excessive, and points to one set of individual time entries to support this contention (2/18/20 Joint

14  Sub. at 9).  This objection has limited merit.

15    Apple's time notes on its project entitled "Locate and Review Prior Art" shows that Apple

16  had one junior lawyer with a technical background, and one senior associate searching for and

17  analyzing prior art references supplied by Apple's expert and outside vendors (90.1 hours).  A

18  junior partner provided oversight and guidance (9.7 hours) with occasional input from a senior

19  partner (1.7 hours).  This was a reasonable billing structure designed to be economical.

20    While the number of hours spent on this task is significant, at least some of these costs were

21  occasioned by the way Plaintiff sought to litigate the case.  In its preliminary infringement

22  contentions, Plaintiff put 50 claims at issue, which according to Apple, forced Apple to analyze

23  hundreds of prior art references (Dkt. No. 90 at 5).  Apple states that it identified 439 documents

24  with its invalidity contentions.  While the time entries provided by Apple are not particularly

25  detailed, spending 101.5 total hours[4] finding and analyzing prior art is reasonable.

26    Apple's time notes on its project entitled "LPR 3-3 Invalidity Contentions" reflect seven

27  timekeepers.  In addition to the attorneys who located and reviewed prior art, Apple added two

28  _____
[4] This number was reduced by 80% to account for work done on the '208 Patent.

junior associates, one senior partner and one senior associate on this project.  Apple states that it staffed up to meet scheduling deadlines and that associate assignments were broken up by patent and by reference.  Apple's time notes, however, do not reveal which patents or references each of the timekeepers was analyzing.  As the moving party, Apple bears the burden of proving its fees were reasonable.  *Blum v. Stenson*, 465 U.S. 886, 897-98 (1984).  While Apple did not require its counsel to detail which patents and references they were analyzing, with a large amount of fees, seven separate billers, and a significant possibility of duplication, a 10% reduction on this category is recommended.  Apple paid $168,828.  A 10% reduction amounts to $16,883.

In examining the time that Apple spend on invalidity, this report considered possible synergies from the IPR proceeding and other litigation.  Apple, however, was not a party to the IPR proceeding.  Its time notes reflect that it spent a small amount of time reviewing prior art from that proceeding (12/5/19 James Decl., Ex. A, 10/17/16 entry for "Analyze the prior art considered in previous IPR proceedings").  But nothing suggests a great deal of synergies, and only one reference from the inter partes review was used in Apple's expert report on invalidity.

### 6.    Claim Construction Proceedings

Plaintiff's only objection to fees for this project is that Apple seeks to recover for activities related to construing elements of claims other than the "in connection with" term (2/18/20 Joint Sub. at 11-12).  For the reasons above, Apple should be allowed to recover such fees, as construing all the disputed terms was necessary to defending the case, whether on infringement or invalidity grounds.

### 7.    Depositions

Plaintiff's only objection to deposition-related fees is that Apple seeks to recover for depositions unrelated to the "in connection with" claim element (2/18/20 Joint Sub. at 12-13).  For the reasons already given, such fees should be allowed as they were necessary to defend the case.

### 8.    Expert Report on Invalidity

Plaintiff objects that the fees Apple is claiming in connection with its expert report on invalidity are excessive (2/18/20 Joint Sub. at 14-19).  Plaintiff claims that it spent 250 hours less

1   preparing its expert on its infringement expert (*Id*. at 15).[5]  But this is not a one-to-one comparison.

2   Invalidity, at least in this case, was more involved than infringement.  The infringement analysis

3   involved assessing whether the elements of the asserted claims read on a single product.  Assessing

4   obviousness and anticipation, in contrast, involved finding numerous prior art references and then

5   comparing them against the elements of the asserted claims.  The latter required more work.

6        The final report of Apple's invalidity expert Bruce McNair, Ph.D., was 338 pages.  From

7   Apple's time records, it appears that a great deal of the report was written by Apple's counsel.  The

8   same team seven attorneys that worked on Apple's infringement contentions worked on Dr.

9   McNair's report.

10       Two entries reflect administrative tasks by associates that should be excluded:

11       • 8/31/17 "Identify Bates numbers of produced prior art documents for invalidity

12          expert report" 0.6 hours

13       • 8/31/17 "Serve opening expert report" 0.3 hours

14       Two other entries also appear either administrative or excessive and should be excluded:

15       • 7/21/17 "Collect invalidity documents for expert" 1.6

16       • 7/21/17 "Send McNair invalidity materials" 3.0

17       A few other entries are internally inconsistent.  For instance, Apple's time entries reflect a

18   conference call with Dr. McNair on July 20, 2017.  Two associates billed 0.8 for this task.  One

19   partner billed 1.2.  Another partner who was identified as being on the call did not bill at all.

20   Similarly, on July 25, 2017, one associate billed 1.5 hours for a call with the expert, while another

21   associate and a partner billed 1.3 hours.  In the overall context of this case and number of time

22   entries, these inconsistencies are minor, but the excess time should be rounded down.

23       As with the time entries on Apple's invalidity contentions, many of the descriptions are so

24   general that it is impossible to see how efficiently the work was divided (*See*, *e.g*., 8/8/17 "Draft

25   sections of invalidity report;" 8/13/17 "Work on McNair invalidity report;" 8/17/17 "Draft the

26   McNair report on invalidity").  It was not unreasonable to have seven attorneys working on this

27

28   _____

[5] Like Cisco, Plaintiff uses an alternative billing structure.  Plaintiff claims that its billing
arrangement permits block billing, which overestimates the amount of time it spent.

1   significant project, especially since they had all worked on the invalidity contentions.  But given

2   the possibility of inefficiencies and lack of specificity in the time entries, a 10% reduction is

3   recommended on this task.  That amounts to $27,972.

### 9.    Mock Trial

5   Plaintiff's only objection to fees related to Apple's mock trial are that such fees are not

6   sufficiently related to the "in connection with" claim element (2/18/20 Joint Sub. at 21).  In this

7   case, Plaintiff sought at least $95 million in damages.  It was reasonable and proportional to this

8   case for Apple to conduct a mock trial to assess risk and test its themes for trial with so much at

9   stake.  Apple would not have undergone this exercise if Plaintiff had not filed exceptional claims.

10   Accordingly, it is recommended that Apple be allowed to recover such fees.

### 10.    Motions in Limine

12   Plaintiff's only objection to Apple's fees for preparing motions in limine is that the motions

13   were not filed because summary judgment was granted first.  For the reasons above, Apple should

14   be allowed to recover such fees because they were caused by Plaintiff filing an exceptional case.

### 11.    Federal Circuit Appeal

16   Apple was paid a flat rate of $300,000 for its successful defense of the Court's Order

17   Granting Summary Judgment in the Federal Circuit.  If such fees are allowed, Apple should be able

18   to recover the full amount, which is within the range expected for such work.  Plaintiff objects that

19   Apple did not provide a granular accounting for the time spent and rates.  Apple gave sufficient

20   detail (12/5/19 James Decl., Ex. B).  Apple employed attorneys with substantial appellate

21   experience and credentials along with the attorneys who litigated the underlying case.  That was a

22   reasonable approach, and the hours spent closely match the flat rate.

### C.    Calculation of Apple's Allowed Attorney's Fees

24   In its initial motion for attorney's fees, Apple requested $3,925,045.01 in fees (*Apple*, Dkt.

25   No. 215 ¶ 25).  During these special master proceedings, Apple reduced its demand to

26   $2,398,401.68, exclusive of its fees on direct appeal (12/5/19 James Decl., Ex. A).  For the reasons

27   given above, it is recommended that Apple's demand should be further reduced as follows:

28   Opposition to Plaintiff's Petition for Certiorari:  $16,633.23

1    10% reduction for preliminary invalidity contentions:  $16,883

2    10% reduction on invalidity expert:  $27,972

3    Specific reductions for administrative tasks and inconsistent entries:  $2,859

4    The total fees that Apple should be awarded are:  **$2,334,054**

5  **V.    PLAINTIFF'S OBJECTION TO CISCO'S FEES**

6    Plaintiff's main objection to Cisco's fees is that Cisco refused to comply with the Court's

7  Order (2/27/20 Joint Sub. at 4). This objection is meritorious.  Instead of the process ordered by the

8  Court, Cisco asks that its fees be compared to recovery in other patent cases and/or evaluated based

9  on the alleged profitability of various law firms.  These approaches fail to adequately test the

10  reasonableness of the fees Cisco is seeking.

11    As Cisco explained in its initial fee application, the Court has "considerable discretion" in

12  deciding how to calculate fees based on its "superior understanding of the litigation" (*Cisco*, Dkt.

13  No. 210 at 18).  The methodology ordered by the Court provides a meaningful check against

14  overbilling.  The various comparisons proposed by Cisco do not.  Apple followed the Court's

15  Order and therefore provided transparency into what it was billing for, and how much it charged.

16  The two lawsuits involved substantially similar claims and defenses.  The main difference is that

17  Plaintiff sought $41 million in hard damages from Cisco, which is less than half of what it sought

18  from Apple.  Yet Cisco has demanded over $1.5 million more in fees than Apple.  For the reasons

19  below, Cisco has not carried its burden of proving that it is entitled to the amount it claims.

20  **A.    Cisco Did Not Comply with the Court's Order to Provide Detailed Time Notes
        on a Project-by-Project Basis**

21

22    Cisco was represented by Baker Botts LLP at the outset of the case.  Baker Botts was

23  replaced by Desmarais LLP in August 2017.  Both firms billed on a flat-monthly-fee basis.  Baker

    Botts billed Cisco during the transition period, but Cisco does not seek to recover the fees that it

24  paid to Baker Botts between August and November 2017 (12/5/19 Wilcox Decl. ¶ 55).

25    In its initial fee request on June 17, 2019, Cisco asked the Court to evaluate its fees based

26  on factors other than a lodestar analysis (*Cisco*, Dkt. No. 210 at 19-23).  On November 20, 2019,

27  the Court held that to resolve Cisco's fee request "Counsel must also provide the special master a

28

1   detailed declaration, organized by discrete projects, breaking down all attorney and paralegal time

2   sought to be recovered. For each project, there must be a detailed description of the work, giving

3   the date, hours expended, attorney name, and task for each work entry, in chronological order"

4   (*Cisco*, Dkt. No. 226 at 2).  On December 3, 2019, the Court ordered Cisco to provide such

5   information by December 5, 2019.  (*Cisco*, Dkt. No. 229 at 2).

6        On December 5, 2019, Cisco submitted declarations that were similar to the ones that it

7   provided with its initial fee request.  Its declarations did not include any breakdown of fees by

8   project, timekeeper or hours spent.

9        At the hearing on February 5, 2020, Cisco was asked to reconstruct its time notes and to

10  provide the detailed billing information ordered by the Court, and Cisco said it would do so.  Cisco,

11  however, once more did not comply with the Court's Order.  Cisco provided Baker Botts' actual

12  times notes for its work on the case (which were records that it claims it maintained in the ordinary

13  course of business, but did not submit previously) (2/14/20 Guske Decl. ¶ 2, Ex.1).  The time

14  entries were not organized by project; instead they were organized chronologically (*Id.*).

15       Cisco also provided a separate spreadsheet dividing Baker Botts' fees into broad categories,

16  such as "Claim Construction Depositions" (2/18/20 Wilcox Decl., Ex. 16).  The spreadsheet did not

17  provide clarity into what projects were done, how they were staffed, and how much time was spent.

18  For example, under the project "Analysis of Defenses," billing entries included:

19  • 2.8 hours "Analyze claim by claim defenses" (*id.*, 10/26/16 entry)

20
21  • 4.3 hours "Reviewing and responding to correspondence from opposing counsel
        regarding discovery disputes, including three discovery letters we sent this week for
22      deficient responses to RFPs, RFAs, and rogs; drafting and sending correspondence to
        opposing counsel regarding limiting number of claim terms and corresponding with
23      joint defense group regarding the same; searching Cisco intranet for documents relating
        to Net2Phone, NetSpeak, Lanai, and Adir; drafting and sending email to litigation lab at
24      Cisco to update production to include the same" (*id.*, 1/15/17 entry), and

25  • 9 hours "Conducting research into pleading patent misuse; reviewing feedback from
        Sarah Guske and Jeremy Taylor regarding amended answer and counterclaims; editing
26      and revising the same based on feedback, including adding factual information to
        background section and revising affirmative defenses and counterclaims; reviewing
27      production and working with Khai to finalize the same; working on slide deck for client
        presentation of trial strategy; conducting research into Cisco Spark system on intranet

28

1  and interplay with SIP signaling; drafting memorandum on the same" (*Id.*, 1/23/17 entry).

2  These are just a few examples.  The spreadsheet did not comply with Paragraph 2 of the
3  Court's Order Re Attorney's Fees and Costs and Appointment of a Special Master, which required
4  a "detailed declaration, organized by discrete projects, breaking down all attorney and paralegal
5  time sought to be recovered.  For each project, there must be a detailed description of the work,
6  giving the date, hours expended, attorney name, and task for each work entry, in chronological
7  order" (*Cisco*, Dkt. No. 226 at 2).

8  Cisco also submitted another spreadsheet purporting to contain total fees for various
9  projects (2/18/20 Wilcox Decl, Ex. 16b).  But this spreadsheet did not have any details about how
10  those numbers were derived, such as which attorneys billed on the project, or how much time they
11  spent.  That spreadsheet also did not comply with the Court's Order.

12  Finally, Cisco submitted a matrix listing which lawyers worked on different projects (*id.*,
13  Ex. 13) and a declaration by Desmarais' Senior Director of Finance, purporting to estimate what
14  percentage of monthly time each timekeeper generally spent on this litigation (*Id.*, Ex. 15).  Except
15  for the Baker Botts time records, none of the materials Cisco submitted was requested, and they are
16  therefore not considered pursuant to paragraph 4 of the Court's Order Re Attorney's Fees and
17  Costs and Appointment of a Special Master (*Cisco*, Dkt. No. 226).

18  It was possible for Cisco to comply with the Court's Order.  Cisco claims that it "provided
19  what information it could" (2/27/20 Joint Sub. at 4:22; *see also* 12/5/19 Wilcox Decl. ¶ 46 ("I
20  include below as much detail as is available regarding the work performed by DLLP attorneys and
21  the basis for the fees it billed to Cisco in this matter.")).  However, Baker Botts already had time
22  records and simply needed to organize them in the manner the Court ordered, as Apple did.

23  Desmarais also could have constructed individual time records using emails, calendar
24  entries, its document management system, and other materials, but chose not to do so.  Cases have
25  discussed counsel reconstructing time records for purposes of a fee petition.  For example, in
26  *Monaghan v. SZS 33 Associates, L.P.*, 154 F.R.D. 78 (S.D.N.Y. 1994), a contingency-fee firm was
27  entitled to an award of attorney's fees under Rule 37 and the court's inherent powers.  In
28  calculating fees, the court explained:  "Monaghan's attorneys contend that since this case is a

simple personal injury case and, as a result, they are retained on a contingency fee basis, there was no need to keep such records, and to now retroactively mandate such records would, in effect, unfairly require them to have predicted SZS' abusive discovery practices." *Id*. at 84.  The court nonetheless allowed Monaghan's counsel to reconstruct their time records and evaluated them accordingly.  *Id*.[6]

In other contexts, courts have held that regardless of how a firm bills its clients, it may be required to provide hourly billing records to the extent it wants to recoup its attorney's fees.  For example, in *Gotro v. R & B Realty Group*, 69 F.3d 1485 (9th Cir. 1995), the defendant improperly removed the case to federal court, and the Ninth Circuit upheld an hourly fee award to a law firm hired on a contingency-fee basis.  Lodestar calculations are used to crosscheck the reasonableness of class counsel's contingency fees when counsel seeks to recover a percentage of a fund.  Plaintiff's counsel, itself, billed on a non-hourly basis in this case, but still was able to provide hourly records for purposes of comparison to Apple (2/18/20 Joint Sub. at 16-19).

**B.     Cisco's Fee Request Cannot Be Effectively Reviewed Because of Its Choice Not to Provide Detailed Records**

While the market is a significant factor in determining the reasonableness of fees under section 285, it is not the only one.  The Court already has ruled that Plaintiff should not have to pay for fees related to engagements outside this litigation (*Cisco*, Dkt. No. 225 at 12).  Cisco's billing records suggest that its flat fee may encompass such activities.

For example, in Baker Botts' time records (2/14/20 Guske Decl., Ex. 1), the entries below appear to reflect activities outside of those in this case:

- 8/4/16 "Joint defense call re extending time to file appellate briefs; discuss appeal strategy with joint defense group"

- 8/15/16 "Correspond with Hulu counsel re appeal brief"

- 10/10/16 "Conducting teleconference with appeal counsel to discuss strategy with respect to appellate brief"

---

[6] In the Second Circuit, where Desmarais is based, this situation apparently arises with enough frequency that courts have adopted a rule of thumb to address it.  *Id*. at 84 ("courts in this Circuit intermittently have seen fit to adopt roughly a 30% fee reduction rule for an attorney's failure to keep contemporaneous time records of their services").

- 10/11/16 "Revise draft appellate brief; discuss revisions with B. Boyd; discuss appellate strategy with W. Stacy"

- 10/12/16 "Revise draft appellate brief; discuss revisions with W. Stacy"

How such activities were factored into Cisco's monthly flat-fee is not clear, and the burden is on Cisco to demonstrate the reasonableness of its fees. Baker Botts did not provide its engagement letter, and when asked about the circumstances of Baker Botts' retention at the March 3, 2020 hearing, Cisco was unable to provide an explanation. It is thus unclear what exactly Baker Botts' monthly fee covered or how it was derived.

It also appears that Cisco put significant efforts into joint defense issues. For example, Baker Botts' time records appear to show joint-defense-related entries on at least the following days, some of which involve multiple timekeepers:  8/4/16; 8/22/16; 8/25/16; 8/31/16; 9/1/16; 9/7/16; 9/8/16; 9/9/16; 9/12/16; 9/13/16; 9/14/16; 9/15/16; 9/21/16; 9/22/16; 9/30/16; 10/6/16; 10/7/16; 10/10/16; 10/11/16; 10/13/16; 10/14/16; 10/20/16; 10/24/16; 10/25/16; 10/31/16; 11/29/16; 12/8/16; 12/9/16; 12/13/16; 12/15/16; 12/19/16; 12/20/16; 12/21/16; 12/27/16; 12/28/16; 12/29/16; 12/30/16; 1/2/17; 1/5/17; 1/6/17; 1/11/17; 1/12/17; 1/14/17; 1/15/16; 1/19/17; 1/26/17; 2/10/17; 2/15/17; 3/6/17; 3/20/17; 3/27/17; 4/4/17; 5/26/17; 6/14/17; 7/7/17; 7/11/17; and 7/19/17 (2/14/20 Guske Decl., Ex 1).

Such activities may be reasonable, or perhaps even efficient, but Plaintiff should not have to finance other proceedings.[7] And from Desmarais' records, it is impossible to tell whether or how much "joint defense" or extraneous activity was involved.

It also is unclear when Baker Botts began representing Cisco in this matter. Cisco's declaration states that "Cisco retained Baker Botts no later than August 2016 to defend it in this litigation" (Cisco, Dkt. No. 210-4 ¶ 9). This does not exclude the possibility that its flat-fee arrangement with Cisco somehow accounted for work related to the IPR proceeding – work that the Court has ordered must be excluded from Cisco's fee petition.

---

[7] In contrast, Apple only appears to seek recovery for one joint-defense-related time entry (12/5/19 James Decl., Ex. A, 11/19/16 entry).

At the hearing on March 3, 2020, Desmarais stated that it did not believe that Baker Botts was representing Cisco in any other matters at the time of its retention.  However, the invoices submitted by Cisco (6/14/19 Wall Decl., Ex. 2) appear to show that at the time of this engagement, Baker Botts was working on other matters for Cisco, the content of which has been redacted.  For example, in August 2016, three additional matters appear to be listed below the $100,346.98 Cisco seeks to recover:

| Item | Date | Type | Category | TK | Rate | Units | Disc | Adj | Amt |
|---|---|---|---|---|---|---|---|---|---|
| | 8/16/16 | Fee | L120 Analysis/Strategy | Stacy, Wayne | $100,346.98 | 1.00 | $0.00 | $0.00 | $100,346.98 |
| 26609788 | **Project:** DISP-001472-Baker Botts IP Lit Fixed Fee  **Description:** Straight Path Litigation | | | | | | | | |
| | 8/23/16 | Fee | L120 Analysis/Strategy | Stacy, Wayne | $8,246.23 | 1.00 | $0.00 | $0.00 | $8,246.23 |
| 26624482 | **Project:** DISP-001472-Baker Botts IP Lit Fixed Fee  **Description:** ███████████ | | | | | | | | |
| | 8/8/16 | Fee | L120 Analysis/Strategy | Stacy, Wayne | $12,208.59 | 1.00 | $0.00 | $0.00 | $12,208.59 |
| 26631388 | **Project:** DISP-001472-Baker Botts IP Lit Fixed Fee  **Description:** ███████████ | | | | | | | | |
| | 8/19/16 | Fee | L120 Analysis/Strategy | Stacy, Wayne | $3,160.33 | 1.00 | $0.00 | $0.00 | $3,160.33 |
| 26632046 | **Project:** DISP-001472-Baker Botts IP Lit Fixed Fee  **Description:** ███████████ | | | | | | | | |

With the numerous other redactions in Baker Botts' time records (2/14/20 Guske Decl., Ex. 1), it is difficult to discern how much time was actually spent on matters that potentially fall outside the Court's Order.  Baker Botts' records contain numerous instances of block billing, further obscuring the inquiry.[8]  Baker Botts' flat monthly rate only remained constant for three of the 12 months for which it seeks fees, which makes its flat rate look more like a black box than a fee cap.  When asked at the March 3, 2020 hearing, Cisco could not provide any explanation for the monthly fluctuations.

From the chronological records Baker Botts provided, the most that can be said is that on some months, the number of hours its lawyers claim to have spent, multiplied by their claimed rates

---

[8] *See*, *e.g.*, Guske Decl., Ex. 1 at 8/25/16, recording 10.9 hours for "Analyzing case management statement; drafting edits to case management statement and correspondence to joint defense group counsel regarding the same; conferring with Wayne Stacy and Jeremy Taylor regarding draft edits to case management statement; conducting research into Judge Alsup's Supplemental Order and case management orders; revising case management statement edits based on the same; conducting research into litigation schedules of co-pending cases, including IPR appeals at the Federal Circuit; updating PowerPoint presentation based on the same; analyzing claims of asserted patents."

1   correlate with the flat fees.[9]  But this does not answer the question of whether the fees were

2   reasonable because the flat rate appears to encompass activities outside the scope of what is

3   compensable.  Cisco further frustrated Plaintiff's ability to object to Baker Botts fees and the

4   undersigned ability to review them by failing to organize its time records in the manner ordered by

5   the Court.  All these facts suggest that the flat-rate structure agreed to by Cisco may include

6   excessive fees that should not be borne by Plaintiff.

7          As noted in the Interim Report, another concern in the flat-monthly-fee context arises where

8   counsel has multiple lines of engagement with the same client that might allow shifting fees

9   between different matters.  Here, at the time it was retained in this case, Desmarais was

10  representing Cisco on other matters (Wall Decl. ¶ 13).  Cisco claims that it "apportioned"

11  $389,588.33 per month for this litigation (*Id*.).  Cisco does not explain how that apportionment was

12  derived, how many other matters existed, what those other matters were, or what overlaps and

13  synergies there may have been in the representation.  Nor did it provide any of its engagement

14  letters for purposes of making such an assessment.  Nor did it provide any contemporaneous

15  budgets or projections to evaluate how much work Cisco anticipated and how much attorney time it

16  would take to substantiate the reasonableness of this apportionment.

17         Finally, Desmarais began working on the case in August 2017.  There had already been a

18  year of highly compressed litigation at that point.  Desmarais had to come up to speed on Cisco's

19  invalidity defenses, non-infringement theories, damages defenses, affirmative defenses, and all the

20  other factual and legal issues in the case.  Such activities were necessarily included in the flat fees

21  paid by Cisco.  Although Cisco does not seek to recover for Baker Botts' fees during this period,

22  which apparently continued through October 2017 at which point Desmarais became lead counsel,

23  Plaintiff reasonably should not have to pay for Cisco's election to have a second set of lawyers

24  learn the entire case.

25

26

---

27  [9] On August 2016, February 2017, and May 2017, Cisco admittedly overpaid Baker Botts (2/20/20 Wilcox Decl., Ex. 16c).  On other months Cisco claims to have paid less than Baker Botts' hourly

28  rates, but from the way Cisco organized its time records, it is unclear what projects these fees purportedly relate to or whether those amounts were reasonable.

Under these circumstances, without resort to the actual time records ordered by the Court, or other reliable information that is not in the record, Cisco has not proven that its flat-rate payments, which oscillated month-to-month for the majority of the litigation, were reasonable.

### C.   The Metrics Provided by Cisco Are Not a Meaningful Check on Reasonableness

Instead of providing hourly fee support, Cisco asks its fees to be compared to the fees expended in other patent cases (12/5/19 Wilcox Decl. ¶¶ 57-63).  But every case is unique, and without a statistically significant number of data points and regression analysis to account for the numerous reasons why litigation may be more or less costly, such a comparison is not particularly reliable.  Under the circumstances here, a more accurate comparison would be the fees incurred by Apple, which this reports marks at $2,334,054 – roughly $1.5 million less than Cisco's demand.[10]

As stated in the Interim Report, it may be possible to determine whether an alternative fee-structure is reasonable without a lodestar analysis.  But Cisco has not provided the best benchmark for doing so – documentation of what the parties believed the tasks, hours, and rates would be prior to the engagement.[11]  And the materials that Cisco has elected to disclose do not permit the rigorous inquiry ordered by the Court.

### D.   Plaintiff's Objections

In addition to its general objections to Cisco's failure to comply with the Court's Order, Plaintiff offers objections to categories of fees that are similar to the ones it made with regard to Apple's fees, *viz.*, that it should not be responsible for fees incurred before June 23, 2017, fees related to invalidity, fees related to claim construction, certain depositions, and motions *in limine* (2/27/20 Joint Sub. at 7-8, 10-18).  To the extent these arguments are relevant in the context of Cisco's flat-rate fees, they should be rejected for the same reasons provided in Section IV above.

---

[10] Plaintiff asserts that its total fees for its three lawsuits against Cisco, Apple, and Ayala was $3,571,892.50.  It did not track fees separately for each matter, write off any of this time, or try to exclude categories of fees, such as fees related to the '208 Patent.

[11] In its unsolicited submission on February 18, 2020, Cisco provided information about the gross hours spent by its lawyers, the amounts generally paid to them, and the profit margins reported by other law firms (2/20/20 Wilcox Decl., Ex. 15).  These materials are not being considered, but they would not be a good crosscheck on reasonableness because such an analysis assumes that all the time spent was compensable.

1  Plaintiff also argues that Cisco overlawyered its depositions by sending two attorneys when
2  Plaintiff only provided one (2/27/20 Joint Sub. at 14-15). This is further evidence that the flat rate
3  paid by Cisco may have been more than what was reasonably necessary to litigate the case.

4  **E.    Calculation of Cisco's Fees**

5  In its motion for attorney's fees and costs, Cisco requested $3,840,292.91 in fees (*Cisco*,
6  Dkt. No. 210 at 18). In its submission herein, Cisco requested the same amount (12/5/19 Wilcox
7  Decl. ¶ 55).

8  As noted above, the undersigned is unable to determine with precision the reasonableness of
9  these fees. While Cisco's counsel no doubt performed substantive work in the case, obtained a
10 good result, and presented declarations as to the commercial value of its work, material gaps in the
11 record remain.

12 In the absence of better information, an award of 50% of Cisco's documented flat fees is
13 recommended, in the sum total of $1,920,146. While imperfect, such award reasonably
14 compensates Cisco, eliminates redundancy and limits the risk of fee stuffing or matter-swapping
15 that can be associated with the kind of flat-fee arrangements employed with its counsel. It is also
16 reasonably close to the amount claimed by Apple and more than 1/3 of what Plaintiff claims it
17 spent litigating the three separate actions involving the same patents.

18 **CONCLUSION**

19 For the foregoing reasons, this report recommends the following:

20 1.    Apple to be awarded its reasonable attorney's fees in the amount of $2,334,054,
21 exclusive of appellate fees subject to further application to the Court under Rule 6.

22 2.    Cisco to be awarded its reasonable attorney's fees in the amount of $1,920,146**.**

23 3.    In its Order Appointing Special Master, the Court directed the undersigned to
24 identify any deductions from the asserted fees that should be trebled. Apple's fee request was
25 reasonable and complied with the Court's Order. No trebling is recommended. The reduction to
26 Cisco's claimed fees, on the other hand, was substantial and would wipe out its fee award if
27 trebled. The reduction arises from a failure in documentation unique to Cisco's attorney-client

28

arrangement and not necessarily from bad faith.  Accordingly, no further reduction is recommended.

The undersigned expended 44.5 efficient billable hours on this matter.  Those costs should be borne 1/3 by each party.

Dated:  March 4, 2020                                          Respectfully Submitted,

By:   /s/ Matthew Borden
                                                                          Matthew Borden
                                                                          Special Master

REPORT AND RECOMMENDATION